**Willy GIPSON, Jr., Appellant,**

v.

**Charles WOOD, Appellee.**

No. 16262.

Court of Civil Appeals of Texas, Houston (1st Dist.).

Feb. 28, 1974.

Foster, Wohlt, Lueders & Hope, Tom W. Foster, David E. Lueders, Houston, for appellant.

Helm, Jones & Pletcher, David H. Burrow, Houston, for appellee.

PEDEN, Justice.

Personal injury suit. Defendant's appeal from the judgment based on jury findings complains only of the award to the plaintiff of $94,500 in damages, not of the liability findings.

Appellant's points of error assert that such damage finding is against the great weight of the evidence, is excessive, is the result of passion, prejudice and bias and that this court should grant a remittitur.

The damage issue covered past and future physical pain and mental anguish plus loss of earnings and of future earning capacity.

This case arose as a result of a collision on January 3, 1970 between the plaintiff's car and a tractor-trailer. The impact was severe. The plaintiff received injuries to his back, neck and shoulders. He continued to work until February, 1972, when he had back surgery, at which time he was found to have a herniated intervertebral disc at the L3–L4 level and a spondylo-

listhesis at L5. The surgeon performed a laminectomy at L3–L4 and a transverse process fusion at the lumbo-sacral joint. One of appellant's contentions is that the damage finding is excessive because the plaintiff failed to establish the causal connection between the accident and his disc surgery. The appellee does not claim any right to recover for the spondylolisthesis.

In resolving points of error claiming that a finding is against the great weight of the evidence, we consider all of the evidence. Garza v. Alviar, 395 S.W.2d 821 (Tex.1965). We have carefully examined the entire record in this case. We review the evidence touching on the severity of the injuries and on their causal connection with the accident but will not attempt a recital of all of it.

We first review some of the testimony of the plaintiff-appellee, Mr. Wood. He was born in 1939, is married and has three children. He has a tenth-grade education. He was in excellent physical condition before the accident in January of 1970. In 1958 or 1959 he had an accident on a motorcycle, but his back was not injured, he received no medical treatment and did not miss work as a result of it.

In 1956 or 1957 he had been sitting in the bow of a boat and had been shoved back into an ornament. It hurt his back at the time, but he did not receive any treatment for it, did not miss a day's work, has recovered from it and did not ever have any more pain in his back as a result of it.

From 1956 to 1962 his work required him to do a great deal of heavy lifting. He helped unload boxcars. The most he remembered unloading in one day was 800 sacks of chemicals, some of which weighed as much as a hundred pounds. He often loaded 60–80 pound valves onto trucks and pallets. He had no back trouble at that time and didn't know of any birth defects in his spine.

He went to work for Thermal Engineering in January of 1963, doing stooping, bending and heavy lifting. He worked in different departments and finally got to be a lead man. He worked 10 hours a day including Saturdays for a long time. He was still working for Thermal Engineering and was making between $9,500 and $10,500 per year when the accident happened on January 3, 1970. He never did lay off a day at Thermal Engineering before the accident because of pain in his back, neck or shoulders. He lifted weights as a hobby and kept himself in very good physical condition.

After the accident on January 3, 1970 he was taken to the emergency room of a hospital, was examined, had x-rays taken and was referred to a Dr. Maness who took more x-rays, examined him, prescribed medicines and gave him a course of treatment. He went in for therapy and medicine about every two weeks. He was sent in the fall of 1970 to a Dr. Medley, who examined him for about five minutes and sent him back to Dr. Maness.

Dr. Maness discussed hospitalization with him in November of 1970 but he told the doctor he couldn't afford to take off work because he had no money saved and had a new home.

He took a lot of aspirin and tried to live with the pain. His back seemed to get worse and his left leg started giving way; it had never done this before the accident. He had taken exercises to help his back, but they hadn't helped. He went to Dr. Barnhart in January, 1972. He didn't do anything to hurt his back while treated by Dr. Maness. Dr. Barnhart ran a myelogram on his back, then operated on it on February 14, 1972. He had worked up until two days before that.

Thermal Engineering went out of business in June of 1972. He could hardly work after the operation until December, 1972; then he began working as a mechanic on cars he bought and sold. He does this because he can stop for a while when his back hurts; he makes an average of about $125 a week at it. His back still

hurts. He has to get down on his knees at the end of the day. When Thermal Engineering went out of business he tried to get a job as a lead man at other air conditioning companies but couldn't. He wasn't able to handle the work required to start out at the bottom.

On cross-examination Wood testified that in 1971 he had been reclassified from lead man to fabricator, and he had been doing that work up until he was operated on. It is heavier work than that of a lead man, and it involved using his back in bending and lifting. He missed only one day's work because of this accident in the two years after it happened. During 1971 he didn't see any doctors for his back, neck or shoulders.

Thermal Engineering didn't go out of business, but it did cut back from 130 or 140 men to just a handful.

Dr. Gerald Maness is a medical doctor. He testified by deposition that he examined Wood on January 6, 1970, three days after the accident. Wood complained of pain in his left shoulder, left cervical muscles and lumbar spine. He denied earlier injuries to those areas. He continued to complain of pain in those areas in later visits. There was tenderness and muscle spasm in the posterior cervical muscles radiating into his shoulders, especially on the left. The lumbar spine was straightened. There was muscle spasm adjacent to the spine, especially on the left.

These symptoms decreased, and there was no objective evidence of muscle spasm or tenderness on November 23, 1970. X-rays taken at his request did not show significant abnormality except in the left shoulder. His diagnosis, based on history, physical examination and x-rays, was that Wood had "multiple abrasions and contusions, cervical sprain, sprain of his left shoulder and a lumbar sacral sprain."

He saw Wood 13 times and discharged Wood as a patient on November 23, 1970, because he had on many occasions asked Wood to quit work to allow his injuries to respond better to therapy or to enter the hospital for further studies. On every occasion Wood refused to do so on the basis that he could not afford to lay off and had to work in spite of medical advice. When he was released he was instructed that if the pain and muscle spasm increased he was to return for follow-up treatment. Dr. Maness said he thought at that time that it would be a matter of time for Wood's symptoms and objective findings to subside. His prognosis was good. There was still pain, but it was bearable. While under Dr. Maness' care, Wood was disabled, but because of economic pressure he refused to follow the doctor's advice to lay off work.

In November, 1970 the doctor felt Wood had received the maximum benefits from conservative treatment but thought that if pain, muscle spasm and tenderness recurred he would need further medical, surgical and hospital care for his shoulder, cervical and lumbo-sacral sprains. In his opinion those sprains were a direct result of the automobile accident of January 3, 1970.

Neurological and other examinations caused Dr. Maness to rule out disc injury or nerve injury, but his pain and spasm lasted longer than usual, so he thought Wood should either lay off work or enter a hospital and have a myelogram if pain persisted. He referred Wood to an orthopedic specialist, Dr. George Medley, for evaluation.

Dr. George Medley testified in detail by deposition about his examination of Wood on November 18, 1970. His diagnosis was: "I felt that Mr. Wood had a lumbo-sacral ligamentous and muscular strain and did not feel that he had a herniated disk or surgical condition in his back at the time of my examination."

Records of Wood's stay at St. Luke's Hospital from February 13 to February 26, 1972 were introduced in evidence by both parties. The report of the radiologist

showed his impression after myelography was: "Disc degeneration and midline protrusion at L3–4 level. Spondylolysis of L5." Dr. Barnhart's postoperative diagnosis was that Wood had 1) a disc herniation at L3–4 interspace and 2) spondylolisthesis at L5. The report of the operation at the L3–4 level states that a definite bulging mass was seen; it was smooth, but quite thick. When it was opened, a degenerated material came forth. Curettement was used to get the last amounts, but the "disc was so degenerate that actually curettement was not necessary . . ."

Dr. Barnhart testified concerning the human spine and nervous system. He is a board certified orthopedic surgeon. He related the history given to him by Wood. He first saw Wood in January of 1972. The symptoms described by Wood were consistent with a ruptured disc at the L3–L4 level. He was a very cooperative patient. The doctor admitted Wood to the hospital for a myelogram, thinking he had both a ruptured disc and a congenital condition called spondylolisthesis. When treating symptomatic spondylolisthesis, doctors look for a disc because it is the disc that is really causing the problem.

This question and answer appear in the record:

"Q (Mr. Burrow) Doctor, let me ask you this: Taking into consideration the history you obtained from the man, the clinical examination and the tests you performed, and the surgery, everything that you did, did you find any reason to believe that that herniated ruptured disc existed before the January, 1970, automobile accident?

"A I found a ruptured disc when I examined him and when I operated on him I found it. There is no way for me to find how long it had existed and no way to know if it existed before that date.

"Q Do you have any test that indicated it happened before the automobile accident?

"A No.

"Q By your history you took of this man, what he had been doing and his relating of any accident he might have had, and taking into consideration the fact he had been working, did you have any reason to believe he got it at work?

"A No— . . at least going on what he told me and what I found, that is all the information I have.

"Q So did you have any reason to believe other than this automobile accident that he had done something, say at home, fallen someplace or anything else that caused the disc?

"A There was no indication to me."

Dr. Barnhart testified further, still on direct examination, that with respect to ruptured discs, the doctors' first diagnosis is usually a lumbar sprain, and as the symptoms become worse the doctors change their treatment and diagnosis. When a disc is removed it leaves some permanent disability to that joint and the patient is more prone to injury in that area in the future.

On cross-examination Dr. Barnhart described a spondylolisthesis and said it could be painful. It is a congenital defect. When a doctor finds this condition in x-rays, this would be a red herring and the doctor would fall into a trap if he failed to keep looking for other causes. He said that Wood had told him he had intermittent back pain for ten years and that although Wood didn't say he hurt his back at that time, Wood thinks of his motorcycle accident as the beginning of his back problem. A ten year history of low back pain would be consistent with a spondylolisthesis. That Wood said the boating accident caused a lot of pain at the lumbo-sa-

cral region but that he got over it; then, several months later he noticed severe lumbo-sacral pain when he did his abdominal exercises and has had trouble with his back ever since.

After a joint fusion to correct a spondylolisthesis, one should not return to hard work for about a year. After removal of a disc, the convalescent period before one should return to work is from three to six months. The doctor thinks the bone graft will be successful. The operations on the two areas solved his problem. A bulging disc can occur over a long period of time. It can come from a trivial thing.

On re-direct examination Dr. Barnhart testified that Wood couldn't have unloaded any heavy sacks at the time he saw him.

We affirm the judgment of the trial court. We hold that under the evidence in this case the jury was entitled to conclude that the accident in question caused the ruptured disc found by Dr. Barnhart in his operation on the plaintiff, that the plaintiff's disability was primarily caused by his ruptured disc and that his damages amounted to $94,500. We consider the medical opinion evidence to have been particularly significant. Dr. Maness testified that on examination Wood complained of pain in his lumbar spine and he found muscle spasm adjacent to the spine. After 13 visits by Wood the doctor concluded that the sprains, including the one in the lumbo-sacral region of Wood's back, were a direct result of the accident of January 3, 1970. Dr. Barnhart, who later treated Wood when his symptoms had become more severe, testified with respect to ruptured discs that a doctor's first diagnosis is usually that the patient has a lumbar sprain but that as the symptoms become worse the doctor changes his treatment and diagnosis.

Further, there was the testimony of the plaintiff indicating that his ability to do heavy labor had not been adversely affected by any conditions or incidents other than the accident in question.

We do not suggest, however, that all the evidence in this case supports the causal connection between the accident and the ruptured disc found in Wood's back. For two examples, Wood's admissions to Dr. Barnhart that he had been bothered by back problems for about ten years and Dr. Barnhart's testimony that he could not tell how long Wood's disc had been ruptured.

We find nothing to support appellant's allegations of passion, prejudice or bias on the part of the jury.

Affirmed.